23051

Michael Stephen MOORE, Appellant v. Tammy E. MOORE (Simmons), Mr. and Mrs. Jessie Sanders, Respondents.

(386 S. E. (2d) 456)

Supreme Court

*Margaret D. Fabri*, Charleston, *for appellant.*

*Robert H. O'Donnell*, of *O'Donnell & Culbertson, P.A.*, Georgetown, *for respondents.*

*H. E. Bonnoitt, Jr.*, Georgetown, *for Guardian ad Litem.*

Heard April 5, 1989.

Decided July 31, 1989.

FINNEY, Justice:

This is a child custody dispute involving appellant Michael Moore (Michael), third party respondents, Mr. and Mrs. Jessie Sanders (Sanderses), Tammy E. Moore (Simmons), and the child, Shawn Stephen Moore (Shawn). The trial court awarded custody to the Sanderses. Tammy E. Moore (Simmons) was a named party below, but did not appeal. Michael Moore appealed to this Court. We affirm in part and reverse in part.

Shawn was seven years old and had been in the physical possession of the Sanderses for approximately four years at the time the order under appeal was issued.

Shawn is the fourth of five children of the marriage of Michael and Tammy Moore. The parents separated in 1983 and were divorced in 1985. Michael was granted temporary custody of their five children by a court order issued in November of 1983.

On October 2, 1985, a Final Decree of Divorce granted Michael permanent legal custody of the five children. This Decree incorporated the agreement of the parents that physical placement of Shawn would remain with the Sanderses "until no longer feasible." The Sanderses were not a party to that action and are not related to Shawn by blood.

In December of 1983, Michael moved to Georgetown to live with his parents so they could help care for his children. He commuted daily to work at the U.S. Air Force Base in Charleston. Michael's parents worked outside the home, and Shawn was enrolled at the Bynum Preschool Center where Mrs. Jessie Sanders was employed. Upon learning of Michael's domestic plight, Mrs. Sanders requested that Michael allow her family to assist him by taking care of Shawn.

Early in 1984, Michael accepted this offer of assistance from the Sanderses, but he continued to see Shawn regularly. Shawn shared a baby-sitter with his younger brother, Paul, and visited in the home with his other sibling. Michael paid for Shawn's day care and medical insurance during 1984. The Sanderses refused his offer of additional financial contribution toward Shawn's living expenses.

Serious injuries sustained in an automobile accident in August of 1984 further hampered Michael's ability to care for his children. Michael's sister helped during this period by taking the baby, Paul, into her home in Columbia. In addition to relieving some of Michael's responsibilities, this arrangement gave Paul, who has cerebral palsy, access to an Easter Seal program in Columbia.

In March of 1985, the Air Force transferred Michael to Alabama. Before leaving, Michael attempted to regain physical possession of Shawn, but he heeded the Sanderses plea to leave Shawn with them until he was established in Ala-

bama. Michael continued to have contact with Shawn during subsequent visits to Georgetown.

During a visit in the Sanderses' home in December of 1985, Tammy E. Moore (Simmons) took Shawn and kept the child for approximately two weeks, refusing to return him. The police apprehended Tammy in Charleston with Shawn and returned him to the Sanderses. After this incident, the Sanderses refused to allow Michael, who still had legal custody, to take Shawn overnight or to visit with him anywhere except in their home.

Michael married Sharon in November of 1986. In December of 1986 Michael, Sharon and his eldest son visited the Sanderses' home. When confronted by Michael about permanently removing Shawn from their home, the Sanderses said they would never return Shawn to Michael and ejected Sharon, Michael and his son from their home.

Michael, *pro se*, commenced this litigation in July of 1987 by requesting a Rule to Show Cause hearing. This rule required the Sanderses to show cause why an order should not be issued allowing Michael to remove Shawn from their home. A hearing was held on August 3, 1987. Michael appeared *pro se*, and the Sanderses appeared with their present counsel. The resulting order allowed physical custody to remain with the Sanderses "at this stage of the proceeding."

In December of 1987 at a motion hearing, the court transferred venue to Georgetown County, appointed a new Guardian ad Litem, and granted Michael, who still had legal custody, holiday visitation rights. Even then, the Sanderses refused to allow Michael to visit overnight with his son, and the parties' counsel had to construct an elaborate schedule for daytime visitation.

The Final Order issued on May 24, 1988, expressly found that Michael and Sharon and the Sanderses were fit custodians. However, the trial court transferred custody to the Sanderses based on its findings that Shawn had bonded with them and Michael had abandoned Shawn. The trial court granted Michael visitation rights, denied both parties' attorneys' fees and granted fees to the Guardian ad Litem and her attorney.

The best interest of the child is the primary and ██ controlling consideration of the Court in all child

custody controversies. *Peay v. Peay,* 260 S. C. 108, 194 S. E. (2d) 392 (1973); *Koon v. Koon,* 203 S. C. 556, 28 S. E. (2d) 89 (1943). Nevertheless, there is a rebuttable presumption that it is in the best interest of any child to be in the custody of its biological parent. *Kay v. Rowland,* 285 S. C. 516, 331, S. E. (2d) 781 (1985); *Cook v. Cobb,* 271 S. C. 136, 245 S. E. (2d) 612 (1978). In *Rowland,* this Court placed a substantial burden on any third party attempting to take custody over a biological parent and ". . . recognized the superior rights of a natural parent in a custody dispute with a third party. Once the natural parent is deemed fit, the issue of custody is decided." 331 S. E. (2d) at 782.

Since the paramount consideration of the courts is the welfare of the child, the dilemma is how to assure that parents who temporarilty relinquish custody for the child's best interest can regain custody when conditions become more favorable.

The Court should consider the following criteria in ■ making custody determinations when a natural parent seeks to reclaim custody of his child.

1) The parent must prove that he is a fit parent, able to properly care for the child and provide a good home. *See Kay v. Rowland, supra,* [custody awarded to fit parent over grandparents]; *Oehler v. Clinton,* 282 S. C. 25, 317 S. E. (2d) 445 (1984), [surviving parent can obtain custody of child if fit].

2) The amount of contact, in the form of visits, financial support or both, which the parent had with the child while it was in the care of a third party. *See People ex rel. Bukovic v. Smith,* 98 Ill. App. (3d) 144 [53 Ill. Dec. 498], 423 N.E. (2d) 1302 (1981) [grandparents refused to allow mother to see her children]; *Brown v. Ellison,* 162 So. (2d) 805 (La. App. 1974) [mother made numerous attempts to visit her son and reclaim him; defendants opposed her efforts and threatened to shoot her if she came near their house].

3) The circumstances under which temporary relinquishment occurred. *See People ex rel. Bukovic v. Smith, supra,* (1981) [mother involved in auto accident relinquished physical custody of children until she could

recover]; *In Re Custody of Saloga*, 96 Ill. App. (3d) 661 [51 Ill. Dec. 128], 421 N. E. (2d) 991 (1981) [mother in financial trouble relinquished custody to father].

4) The degree of attachment between the child and the temporary custodian. *See Cook v. Cobb, supra*, [child lived with grandparents for 4½ years]; *Driggers v. Hayes*, 264 S. C. 69, 212 S. E. (2d) 579 (1975) [child lived with grandparents for 10 years, 9 months].

The rebuttable presumption standard requires a case by case analysis. In the case at bar, there is no dispute as to Michael's fitness, his ability to provide proper care and a good home for Shawn nor as to the circumstances surrounding his temporary relinquishment of custody. The remaining issues are (1) the amount of contact by the natural parent with the child, and (2) the degree of attachment between the child.

As to the matter of contact, the trial court held that Michael's limited contact over a four year period amounted to abandonment. We disagree.

According to the record, Michael was in frequent personal contact with Shawn until the Air Force transferred him to Alabama, and he contributed to Shawn's financial support during 1984 to the extent allowed by the Sanderses. He also attempted to carry Shawn to Alabama. After moving to Alabama with three of his children, Michael maintained contact with Shawn whenever he made the trip back to Georgetown during the summer and on holidays.

Further, the record reveals that the Sanderses limited Michael's contact. They refused his offer of increased financial contribution toward Shawn's living expenses, would not allow Michael to take Shawn overnight or to visit with Shawn anywhere except in their home, and rebuffed Michael's repeated attempts to take custody of the child. By restricting Michael's contact, the Sanderses created an atmosphere where their relationship with Shawn blossomed while Michael's relationship with his child was impeded.

The next issue is the degree of attachment between Shawn and the Sanderses. Even though there may exist a psychological parent-child relationship, the mere existence of such a bond is inadequate ground to jus-

tify awarding permanent custody to the Sanderses; particularly in an instance where such a relationship was built on the foster parents' overt acts which inhibited the development of a normal relationship between the natural parent and his child. We conclude that bonding is only one of the major factors to be considered in deciding a custody dispute involving third parties seeking to deprive a natural parent of custody of his child.

Moreover, Michael and the Sanderses initially ██ reached an agreement as to the temporary nature of the child-care arrangement. Shawn was placed in the Sanderses' home with the understanding that Michael would resume custody when he was able to do so. If a party relinquishes custody in good faith because of some temporary inability to provide for the child, such parent should be able to regain custody upon a showing that the condition which required relinquishment has been resolved. Child custody should not be subject to change because of adverse possession.

Accordingly, the decision of the Family Court determining custody is reversed, and appellant Michael Stephen Moore is awarded custody of Shawn Stephen Moore. So much of the Family Court order as concerns attorney fees and Guardian Ad Litem fees is affirmed.

Affirmed in part and reversed in part.

GREGORY, C. J., and HARWELL, CHANDLER, and TOAL, JJ., concur.